Filed 3/15/23  P. v. May CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>JOLENE JEAN MAY,<br><br>  Defendant and Appellant. | E078021<br><br>(Super.Ct.No. FVI19002218)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Antoine F. Raphael, Judge.  Affirmed.

Edward Mahler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

<u>INTRODUCTION</u>

A jury found defendant and appellant Jolene Jean May guilty of possession of methamphetamine for sale. (Health & Saf. Code, § 11378.) A trial court placed her on probation for two years under specified terms and conditions. On appeal, defendant argues the trial court erred in admitting statements she made to police officers in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Thus, she contends her conviction should be reversed and the matter remanded for a new trial. We affirm.

<u>FACTUAL BACKGROUND</u>

*Prosecution Evidence*

Detective Reynoso conducted surveillance of defendant's residence and observed, within a one-hour span, more than 15 vehicles and five or six individuals on foot come to the residence briefly and then leave. He testified at trial that based on his training and experience, this activity was consistent with a house being used to sell narcotics. On February 1, 2017, he executed a search warrant at defendant's residence, along with approximately five other police officers. They knocked on the front door and announced they were from the sheriff's department and had a search warrant. Someone answered the door and allowed them in. Defendant, her husband, and her children were there, along with three other adults. After the officers brought everyone to a main area, they conducted a protective sweep of the house, with their guns drawn but pointed toward the ground. Once they deemed the house safe, the officers put their guns back in their holsters.

2

Detective Brosowske testified that he asked defendant whose room was whose. She told him the room to the right down the hallway was hers and pointed out a couple of the kids' rooms. Defendant then talked to Detective Reynoso.

Detective Reynoso testified that he asked defendant if there were drugs in the house and asked where they were. Defendant brought him to the den area and told him that's where the drugs were. He saw a few small baggies that contained methamphetamine residue. Detective Brosowske then found a Ziploc freezer bag containing 167 grams of methamphetamine. Officers also found a scale, baggies, and $370 in cash. Detective Reynoso subsequently read defendant her *Miranda* rights, and she said she understood them and was willing to speak with him. During a recorded interview, defendant admitted she was selling methamphetamine, about an ounce or two a day, and was making $300 to $400 per day.

*Defense Evidence*

Defendant testified on her own behalf at trial. She testified that at the time the police searched her house, she was addicted to methamphetamine and used about one gram per day. Defendant testified that she was in possession of methamphetamine for personal use and not to sell it. She further said Detective Reynoso told her that if she said she sold drugs and gave him her contacts, the case would not go to the district attorney, and she would not go to jail. Thus, nothing she said to Deputy Reynoso after he read her *Miranda* rights was true.

3

*Rebuttal*

Detective Reynoso testified that contrary to defendant's testimony, he did not tell her what to say during the interview under *Miranda* or make any promises.

DISCUSSION

The Trial Court Properly Admitted Defendant's Statements to the Officers

Defendant argues the evidence of statements she made to the police detectives, in violation of her *Miranda* rights, were improperly admitted. Specifically, she claims her responses to Detective Brosowske's "question as to who occupied each of the bedrooms" and Detective Reynoso's "inquiry that she show him the location of drugs" were products of custodial interrogation and should have been suppressed. Defendant also claims that because of the "inherently coercive nature of the first *unmirandized* interrogation," her responses to Detective Reynoso's subsequent questioning should have also been suppressed, even though she waived her *Miranda* rights. She claims that Detective Reynoso gave her the *Miranda* warnings while he was "already interrogating" her and she was in custody; thus, her "second statement was [the] product of the first unmirandized statement[s] as well as the coercive environment." We disagree and conclude the court properly admitted the evidence of her responses.

A. *Procedural Background*

Prior to trial, the prosecution filed a trial brief, which included a motion seeking to admit pre-*Miranda* statements defendant made to police officers during the search of her

4

residence and before she was placed under arrest.[1] Defendant subsequently filed a motion in limine and asked for an Evidence Code section 402 hearing concerning the admissibility of any statements she made to any police officer.

On August 3, 2021, the court held a hearing and addressed the admissibility of the statements. The prosecutor called Detective Brosowske as a witness. Brosowske said he executed a search warrant at defendant's residence on February 1, 2017, along with three to four other officers, including Detective Reynoso. They knocked on the door, entered the residence, and informed everyone a search warrant was being served. The officers detained all the occupants inside in order to secure the area "and make it safe for a search." Detective Brosowske said there were "quite a few" occupants, including defendant, her two children, and four or five other adults. When securing the house, the officers had their guns drawn but angled at the floor ("low ready"). As soon as the house was deemed safe, they holstered their guns. After the house was secured, Detective Brosowske asked defendant "whose room [was] whose," and she pointed out one of the bedrooms and said, "That one is mine," and said the kids' bedrooms were down the hall.

Detective Brosowske testified that when he spoke to defendant, his gun was not drawn, but was in his holster. He said he had not told her she was under arrest, and she was not in handcuffs. He also said they were standing in the hallway near her room, and she was free to move around to show him whose room was whose. Detective Brosowske said his demeanor when he asked defendant about the rooms was, "[j]ust normal."

---

[1] The motion did not name any specific statements.

On cross-examination, Detective Brosowske said that when the occupants were detained, they were asked to go to an area of the house already deemed safe and stand with an officer. They were not put in handcuffs, but they were also not free to move around. Detective Brosowske confirmed that when he asked defendant whose room was whose, she was not free to leave the house, but she was free to move in the general vicinity where she was. When asked how long he was in the house before he asked defendant whose room was whose, Detective Browoske said, "It would have been pretty quickly, within a couple minutes." He confirmed that he did not advise defendant of her *Miranda* rights before asking her whose room was whose. He also did not ask her any other questions.

The prosecutor then called Detective Reynoso to testify. Reynoso said when they executed the search warrant there were approximately seven or eight people at defendant's residence. He said he was present when Detective Brosowske asked defendant whose room was whose, and he confirmed that none of the officers had their guns drawn at that point and defendant was not in handcuffs. Detective Reynoso said that immediately after defendant pointed out her room to Detective Brosowske, he (Reynoso) "asked her to direct [him] to any narcotics that would be in the house." Defendant took him to the north part of the house and showed him an area that contained "scraper" bags. He explained that "scraper" bags were bags that previously contained methamphetamine, but now just had residue. Detective Reynoso asked defendant if those were all the drugs in the house, and she said yes. After that, Detective Brosowske brought him a "large freezer-sized bag of methamphetamine out of the bedroom." The

6

officers then collected evidence and put it all on a table. At that point, Detective Reynoso read defendant her *Miranda* rights. She said she understood her rights and was willing to talk to him. She then admitted she sold methamphetamine, and told him how much the drugs cost her and what her profit was from selling them.

Defendant testified as well and said that on the day of the search of her residence, she and her husband stepped outside and heard a helicopter and saw police officers yelling at them to put their hands up, with their guns drawn. Defendant testified that she was there with her four kids and four other adults. She said they were all separated, and Detective Reynoso took her to the den and said, "just say that you sell drugs and give me your connects, the ones that sell big and have weapons." He also said he would not press charges and would not send the matter to the district attorney, and she would not go to jail. Defendant testified that Detective Reynoso read her *Miranda* rights just before he left. Defendant said she told Detective Reynoso whom she got the drugs from and the prices of the drugs before he read her *Miranda* rights. On cross-examination, defendant said she was afraid of going to jail, so she told the officer what he wanted to hear. She confirmed that the officers had their guns drawn when they came in, but she could not recall when they put them in their holsters. She said Detective Reynoso was pointing his gun at her when he talked to her in the den. Defendant then said she thought he put his gun away when she started to talk.

After hearing witness testimony, the court issued its ruling that defendant was not in custody at the time she made her pre-*Miranda* statements; thus, they were admissible. The court summarized that there were "three distinct statements" made—the pre-*Miranda*

7

statements dealing with the questions about the layout of the rooms and the location of the drugs in the house, and the post-*Miranda* statement. The court noted that after hearing the witnesses testify and seeing defendant's demeanor on the stand, it credited Detective Reynoso's testimony to the extent there was any conflict with defendant's testimony. The court also found there were eight or nine occupants at the house and five officers involved with the execution of the warrant. The court found that while guns were drawn when they entered the residence, the officers holstered them after the safety sweep was completed. The court further found that defendant was not handcuffed and was told she was not under arrest, and that she made the statements under her own volition. The court stated that the in-home interrogation was not custodial, noting that there were twice as many occupants as officers; thus, it was not a police-dominated atmosphere.

Looking at the totality of the circumstances, the court ultimately found that defendant was properly detained during the execution of the search warrant, and she was not in custody at the time she made the statements prior to being advised of her *Miranda* rights. Thus, the court found those statements admissible. The court found that defendant's *Miranda* waiver was knowing, intelligent, and voluntary; thus, the post-*Miranda* statements were also admissible.

B. *Standard of Review*

" 'In applying *Miranda* . . . one normally begins by asking whether custodial interrogation has taken place. "The phrase 'custodial interrogation' is crucial. The adjective [custodial] encompasses any situation in which 'a person has been taken into

8

custody or otherwise deprived of his freedom of action in any significant way.' " '

[Citation.] 'Absent "custodial interrogation," *Miranda* simply does not come into

play.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) The question of whether

defendant was in custody for the purposes of *Miranda* is a mixed question of law and

fact. (*Ibid.*) The first inquiry is factual—the trial court simply needs to ascertain the

factual circumstances surrounding the interrogation. (*Id.* at p. 402.) Once the relevant

facts are ascertained, the trial court must determine whether, under the relevant legal

principles, defendant was in custody for the purposes of *Miranda.* (*Ibid.*) On appeal, we

review the trial court's factual findings under the substantial evidence standard of review.

(*Ibid.*) However, we review the trial court's legal determination of the custody issue

independently. (*Ibid.*)

C. *Defendant Was Not in Custody*

Defendant contends she was in custody when Detective Brosowske asked her who

occupied each bedroom in the house and she pointed to a bedroom she occupied, and

when Detective Reynoso asked her to direct him to where the narcotics were, she showed

him an area where the "scraper" bags were, and she said there were no other drugs in the

house. Defendant claims that her responses to the detectives' inquiries were "the product

of an unlawful interrogation and should have been suppressed." We disagree.

"Custodial interrogation has two components. First, it requires that the person

being questioned be in custody. Custody, for these purposes, means that the person has

been taken into custody or otherwise deprived of his freedom in any significant way.

[Citation.] Furthermore, in determining if a person is in custody for *Miranda* purposes

9

the trial court must apply an objective legal standard and decide if a reasonable person in the suspect's position would believe his freedom of movement was restrained to a degree normally associated with formal arrest." (*People v. Mosley* (1999) 73 Cal.App.4th 1081, 1088 (*Mosley*).) "The totality of the circumstances surrounding an incident must be considered as a whole. [Citation.] Although no one factor is controlling, the following circumstances should be considered: '(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' [Citation.] Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview." (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403-1404 (*Pilster*).) "[A] suspect who is detained during the execution of a search warrant has not suffered a ' "restraint on freedom of movement" of the degree associated with a formal arrest,' and is thus not 'in custody' for purposes of *Miranda*." (*United States v. Burns* (7th Cir. 1994) 37 F.3d 276, 281.)

Here, defendant has failed to demonstrate that she was restrained to a degree normally associated with formal arrest. (*Mosley*, *supra*, 73 Cal.App.4th at p.1088) When Detective Brosowske asked her whose room was whose, she had not been formally

10

arrested. Although defendant and the other occupants were initially detained in one area of the house, it was only while the officers conducted a safety sweep with their guns pointed toward the ground. Notably, there were more occupants than officers, so it was not a "police-dominated atmosphere," as defendant claims.[2] (See *Pilster*, *supra*, 138 Cal.App.4th at pp. 1403-1404.) Although the occupants were not free to move around during the safety sweep, they were not in handcuffs. Furthermore, Detective Brosowske testified that when he asked defendant whose room was whose, she was free to move in the general vicinity where she was. Moreover, he was the only officer questioning defendant, and the question was open-ended, non-accusatory, and investigative. Detective Brosowske simply asked the question to aid his investigation, and he was not aggressive or confrontational. Further, the record indicates defendant readily pointed out the rooms. The circumstances were the same when Detective Reynoso asked defendant to show him where the drugs were located in the house. She readily took him to the north part of the house and showed him where they were and, when he asked if that was all the drugs in the house, she said those were all the drugs.

On this record, we cannot say a reasonable person in defendant's position would believe her freedom of movement "was restrained to a degree normally associated with formal arrest," when the detectives asked her the questions at issue. (*Mosley*, *supra*, 73 Cal.App.4th at p. 1088.) Thus, the court properly ruled that defendant was not in custody

---

[2] Defendant points out that respondent claims five deputies participated in the search, whereas the evidence showed there were six. Such discrepancy is immaterial since the court found there were eight or nine occupants at the house.

for purposes of *Miranda*, and it did not err in denying her motion to suppress the statements that were made.

Furthermore, in light of our conclusion that defendant's responses were not obtained in violation of *Miranda*, we reject defendant's related claim that her admission to selling drugs, given after waiving her *Miranda* rights, was the tainted product of the detectives' initial questions. In any event, "we observe that admissions made pursuant to full *Miranda* waivers may not be suppressed because of prior *Miranda* violations unless the later admissions were *in fact* involuntary." (*People v. Samayoa* (1997) 15 Cal.4th 795, 831.) Defendant does not claim on appeal that her post-*Miranda* confession was involuntary. We additionally note the other evidence that defendant was selling methamphetamine, including the foot and vehicle traffic at her residence consistent with drug sales, and the 167 grams of methamphetamine, the scale and baggies, and the $370 in cash, found inside her home. Accordingly, in view of this evidence and defendant's confession after she waived her *Miranda* rights, the admission of her responses to the detectives' initial questions, even if erroneous under *Miranda*, was harmless beyond a reasonable doubt. (See *Ibid*.)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
                                                           J.


We concur:


CODRINGTON _____
                Acting P. J.


MENETREZ _____
                J.


13